UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHESTER BROWN,<br><br>    Petitioner,<br><br>    v.<br><br>WARREN L. MONTGOMERY,<br><br>    Respondent. | No. 2:19-cv-00291-TLN-CKD P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state inmate proceeding pro se with a federal habeas corpus application filed pursuant to 28 U.S.C. § 2254. ECF No. 1. Petitioner challenges his conviction following a jury trial in the San Joaquin County Superior Court for two counts of trafficking minors without force. Petitioner was sentenced to a determinate term of 21 years and 4 months. Respondent has filed an answer to the petition. ECF No. 17. Petitioner did not file a traverse and the time to do so has expired. Upon careful consideration of the record and the applicable law, the undersigned recommends denying petitioner's habeas corpus application for the reasons set forth below.

**I.    Factual and Procedural History**

    **A.  Direct Appeal**

Following his conviction, petitioner filed a direct appeal. On August 10, 2017, the California Court of Appeal affirmed petitioner's conviction. See ECF No. 17-1 (direct appeal opinion). In rendering its decision, the California Court of Appeal summarized the facts as

1

follows:[1]

> Stockton Police Officer Wesley Grinder testified as an expert on prostitution. He explained that a "blade" is an area known for heavy streetwalking, and there are blades in Stockton. In addition to advertising by wearing skimpy clothing and waving at passing cars, prostitutes use many Internet sites, on some of which they post pictures of themselves. Often a prostitute is not allowed by her pimp to use phones; those are controlled either by the pimp himself, or by a so-called "bottom bitch," who stays near the working prostitute. These "bottom bitches" act as a pimp's right hand by screening clients. They are loyal, and help insulate the pimp from liability. Isolating prostitutes from the outside world and any support system they may have is a common way to facilitate their compliance.
>
> On the late afternoon of May 25, 2014, Stockton Police Officer Terrance Washington was sent to look into a reported kidnapping, and went to a gas station near the Motel 6 on Plymouth Road. He found a teenage girl (B.) sitting on the ground amidst suitcases, dressed in "short shorts and a low cut halter top," distraught and "crying hysterically." She said she was afraid for her life, wanted to get away from "Chester," and wanted the police to call her father. Washington and other officers waited for "Chester" and arrested petitioner when he soon drove by in a car with three female passengers.[2] When stopped and asked his name, petitioner said it was "Bakori Newton" and he claimed to be 17 years old. After detaining petitioner, Washington spoke to D., one of the females in the car. She was wearing cut-off shorts. Condoms and many credit cards were found in the glove compartment. A book entitled "The 40 Laws of the Game: Pimpology" was found in the trunk, and some of the pages were highlighted. Nearby, Officer Robert Dominguez found a telephone by the car, which rang when Washington dialed the number B. had for petitioner. Later, petitioner admitted it was his telephone.
>
> B. reported that petitioner forced her to create an account on an Internet site; the account showed her in an advertisement for an "escort," gave her location, and had photographs that displayed her breasts and genitalia. Washington researched petitioner's telephone number on the Internet and discovered the number was associated with several different websites bearing similar ads. A photograph on one site resembled another one of the females who had been found in petitioner's car when it was stopped. B. was 17, and D. was 14. The other girls in the car with petitioner were 16 and 14.
>
> Detective Michael George spoke with D. on May 27, 2014, at juvenile hall. On her telephone he found Internet escort

---

[1] Petitioner does not rebut the presumption of correctness that applies to these state court findings of fact nor does he argue that they are based on an unreasonable evidentiary foundation. See 28 U.S.C. § 2254(e)(1); Gonzalez v. Pliler, 341 F.3d 897, 903 (9th Cir. 2003). Therefore, they are reproduced in their totality and relied upon by this court in conducting its legal analysis.

[2] Due to the procedural posture of this case, all references to "defendant" in the direct appeal opinion have been changed to "petitioner."

2

advertisements associated with the numbers of D.'s and petitioner's telephones. He obtained a warrant to search petitioner's telephone. The search revealed photographs—including of B.—depicting prostitution-related activities, such as young females in suggestive poses with telephone numbers to call to arrange meetings.

B. testified she was 17 on May 23, 2014, and had met petitioner that March in Antioch. They texted each other and visited once at her cousin's apartment. Petitioner told her he was a pimp and told her "how much money you could make, and stuff like that. Kind of persuasive." He assured her he could protect her, but she just considered him a casual friend.

Trial exhibit 56 consisted of 79 pages of mostly redacted texts taken from petitioner's telephone—with the subscriber name of "Bakori Brown"—beginning before and lasting until the end of the charged offenses. At times B. was flirtatious with petitioner in these texts, and when he asked for naked pictures of her, she complied. On May 12, 2014, he proposed taking her to Stockton over a weekend, to work as a "ho." In further texts, she said she was scared, but he told her it was easy and he would protect her and teach her the trade. Later texts, sent while the two were in Stockton, discussed prices for sexual acts, and the need for B. to keep in touch with petitioner when she was on a "date."

On May 23, 2014 (Friday), B. texted petitioner, who knew she was only 17, because she had had an argument with her mother and wanted to talk to him. She left her mother's home to go with petitioner, who drove her to Stockton. D. was in the car. The three eventually went to a motel. There, while the girls were alone, D. told B. they would walk "the blade" and she would take pictures of B. to post on an Internet escort site. B. protested that that was not why she had come with petitioner to Stockton, but then petitioner came in and said it was a "'money weekend'" and "ya'll going to do this, ya'll going to do that." D. took "exotic pictures" of B. and they were posted on "a call girl website," along with her telephone number. Because nobody called, they got dressed and went out to the streets. Petitioner drove both girls to a "ho stroll" at about 9:00 p.m., and during this time D. told B. "what type of person" petitioner was, and B. recorded D. on her telephone describing petitioner.

Soon a man picked B. up, they had sex in a house, and he paid her $60, the amount petitioner had told her to ask for. She gave that money to petitioner. She was terrified and felt she had no choice but to comply. After she and D. returned to the motel, petitioner accused B. of having had a customer she had not told him about. He told her he should kill her, and that he needed to know everything she was doing at all times. B. and D. strolled again for about an hour, then petitioner took them back to a motel. Petitioner saw the recording on B.'s telephone, in which D. had described (in apparently negative terms) petitioner's "demeanor and what he's about" to B. He and D. argued, and he beat and choked her in front of B. He made D. strip naked and told her to leave that way, claiming everything she had belonged to him. D. left, but returned shortly and stayed.

3

The next morning (Saturday) the girls got dressed to return to the "blade." B. had another customer, and when it was over again gave petitioner the money. That night, while D. was with a customer, petitioner forced B. to fellate petitioner. He told her that if she told anyone he would beat her worse than he had beaten D. On Sunday morning petitioner again asked B. to fellate him, which she did.

When B. asked to go home, petitioner's reply was "'Some money need[s] to be made before anybody can go anywhere.'" Another time he said he would "beat [her] ass," and "don't play with me." Two other girls were with them and were depicted in photographs introduced at trial; an officer testified these were the two other girls found in petitioner's car.

An incident where a customer offered $200 to let him rape B. caused her particular distress about her situation, although the rape did not occur. Eventually B. called 911. According to the 911 transcript in the record, the accuracy of which the parties do not dispute, B. reported that she had been kidnapped, but then hung up. The dispatcher called back and then B. spoke as if she were speaking to a customer, asking to meet in a motel, discussing the price and details. The 911 dispatcher understood B. could not speak freely and arranged for her to go to a particular motel. There were further 911 calls, and B. was able to tell the dispatcher the man was named Chester, he "worked me as a prostitute" and held her against her will, and he had other prostitutes in the car. On cross-examination, B. admitted she had worked as a prostitute before she had ever met petitioner. But she had not intended to work as petitioner's prostitute that weekend, with him as her pimp, and give up control of her "choices."

A jailhouse informant, Tyquan Jeter, had been convicted of (misdemeanor) false imprisonment and domestic violence in 2013, and was facing jail time because he did not complete certain classes. He came forward with alleged statements petitioner made while they were incarcerated together, and was promised that if he testified truthfully and completed the required classes, he would not have to serve additional time. He also had a 2007 theft conviction. Petitioner had been his cellmate for a week or two and said he was "pimping, he had four underaged girls, three overaged girls. He had made a lot of money. He got caught because the girl called and said ... something like she was kidnapped or whatnot." Petitioner had been around pimping all his life, his father having been a pimp and his mother having been a prostitute. He had a tattoo of the word "'pimp'" on his hand, but tried to hide it. He told Jeter a girl who was going to testify was named B., and asked Jeter to contact her "and just tell her not to show up." Petitioner told Jeter one of his girls "wasn't picking up the phone, and he said something like 'Bitch, don't ever do that again. Bitch, I'll kill you if you don't answer your phone.'" He bragged about making money with seven girls, and said he would "post the [girl's] ass" on certain websites. He did not care that some of his girls were underage.

An employee from Metro PCS testified as an expert about cellular tower information. He identified the subscriber of petitioner's

4

telephone as Bakori Brown, and authenticated trial exhibit 56, containing the text messages from that telephone. A crime analyst testified he had examined three telephones relevant to this case (B.'s, D.'s, and petitioner's) and had prepared trial exhibit 128, a PowerPoint reflecting the information from the telephones. This included photographs and videos, including of B. He found some of the racy or semi-naked photographs from the Internet escort sites on petitioner's telephone, and many texts discussing prostitution activities.

D. did not testify. However, her juvenile records showed she had had prior police contacts for loitering for purposes of prostitution in Oakland.

Petitioner testified he first met D. on a website, and met her in person in May 2014. He first met B. in Antioch. On May 23, 2014, he picked D. up "from the ho stroll" in Oakland and then drove to Antioch to pick up B. Eventually they went to a motel in Stockton. He had intended that D. would teach B. how to steal (from men for petitioner), but B. was already a prostitute and did not want to steal. Later, B. went out "hoing, I guess." She asked to be taken to the "blade" and "[D.] was watching her back." On Sunday, B. asked him to take her home and he agreed, but he picked up two other girls on the way. He and B. had an argument because petitioner had things to do and she could not pay for the gas needed to drive her to Antioch. He eventually dropped her off with all of her things, and was stopped by the police. He never had sex with B., although he admitted that— at his request for "sexy" pictures—she sent him pictures of her vagina, buttocks and breasts, and that on May 24, she texted him regarding fellatio. According to petitioner, Tyquan Jeter was lying, and had access to petitioner's paperwork, from which he could have learned about his case. Petitioner took no money from B. Both girls were prostitutes before he met them, and he was only trying to help them.

Petitioner admitted a juvenile adjudication for felony assault with a firearm. He had lied about his name to the officer when he was stopped because he had an outstanding warrant and did not have his driver's license. He admitted he had "'pimp'" tattooed on his hand, as well as "'pay me,'" but denied he was a pimp. He claimed he was performing rap music on videos in which he used the term "pimp." In some texts from his telephone he said he was a pimp, or the exchanges clearly referenced specific sex transactions, but he claimed some were not from him, and others just reflected his "image." He admitted that Internet escort photographs of B. were on his telephone, and his telephone number was on at least one of the websites. He claimed B. "put herself on the blade."

Many texts from petitioner's phone referenced prostitution and included explicit photographs for websites and reference to specific sexual acts for specific dollar amounts. D. referred to petitioner as "Daddy" in texts. Petitioner denied he and D. planned to use B. as a prostitute, but claimed they were going to "train her to steal." He insisted he was not a pimp, testifying: "I can't stop nobody from doing nothing. Everybody [makes their] own decisions."

5

ECF No. 17-1 at 4-10.

### B. Federal Habeas Petition[3]

Petitioner first contends that California Penal Code § 236.1 criminalizing human trafficking is unconstitutionally vague because it defines the same crime as pandering. More specifically, petitioner asserts that this state criminal statute does not give an ordinary person notice of what conduct constitutes human trafficking as opposed to pandering. In his second clam for relief, petitioner contends that California Evidence Code § 1161(b) violates his rights to present a defense, to cross-examine witnesses, and to due process.[4] Here, petitioner argues that he was not allowed to present evidence that the victims chose to act as prostitutes on their own and that he therefore did not induce them to commit commercial sex acts.

Respondent acknowledges that petitioner has properly exhausted these claims in state court. ECF No. 17 at 6. As to the merits, respondent first submits that petitioner's vagueness challenge to the human trafficking statute is foreclosed by the Supreme Court's decision in United States v. Batchelder, 442 U.S. 114 (1979). ECF No. 17 at 18-20. The California Court of Appeal did not unreasonably apply the Batchelder decision in rejecting petitioner's first claim for relief. ECF No. 17 at 19-20. With respect to petitioner's second claim for relief, respondent points out that the excluded evidence that the female victims had engaged in prior acts of prostitution would have been cumulative of other evidence, including petitioner's direct testimony, and would not have bolstered his defense at trial. ECF No. 17 at 24. Moreover, respondent contends that the state court's denial of this claim was not contrary to any clearly established federal law governing the admission of evidence. ECF No. 17 at 22-24 (citing United

---

[3] After the court ordered respondent to file an answer to the habeas application, petitioner filed an amended § 2254 petition without being granted leave to do so by the court. ECF No. 11. Therefore, the original § 2254 petition is the operative pleading before the court. The court notes that the claims in the original and first amended § 2254 petition are the same. The only difference between the two pleadings is that the first amended § 2254 includes a copy of the petition for review filed in the California Supreme Court.

[4] California Evidence Code § 1161(b) provides that: "[e]vidence of sexual history or history of any commercial sexual act of a victim of human trafficking, as defined in Section 236.1 of the Penal Code, is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."

States v. Gemma, 818 F.3d 23 (1st Cir. 2016)).  Lastly, respondent asserts that the exclusion of this evidence did not have a substantial and injurious effect or influence on the jury's verdict so as to warrant federal habeas relief.[5]  ECF No. 17 at 25.

## II.     AEDPA Standards

To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that the state court decision resolving the claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000) ] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103. The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

---

[5] On federal habeas review, an error is harmless unless it "had [a] substantial and injurious effect or influence in determining the jury's verdict," i.e., it resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted).

1  U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and
2  standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)
3  (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent
4  may constitute "clearly established Federal law," but circuit law has persuasive value regarding
5  what law is "clearly established" and what constitutes "unreasonable application" of that law.
6  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,
7  1057 (9th Cir. 2004).
8        Relief is also available under the AEDPA where the state court predicates its adjudication
9  of a claim on an unreasonable factual determination.  28 U.S.C. § 2254(d)(2).  The statute
10 explicitly limits this inquiry to the evidence that was before the state court.  See also Cullen v.
11 Pinholster, 563 U.S. 170 (2011).  Under § 2254(d)(2), factual findings of a state court are
12 presumed to be correct subject only to a review of the record which demonstrates that the factual
13 finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in
14 light of the evidence presented in the state court proceeding."  It makes no sense to interpret
15 "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in §
16 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the
17 same record could not abide by the state court factual determination.  A petitioner must show
18 clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546
19 U.S. 333, 338 (2006).
20       If petitioner meets either of the 28 U.S.C. § 2254(d) standards, then the federal habeas
21 court reviews the merits of the constitutional claim under pre-AEDPA standards in order to be
22 entitled to relief.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).  While there is no
23 required order in which these two inquiries must be conducted, federal habeas courts generally
24 apply Section 2254(d) analysis first because it is a high hurdle for petitioners to overcome.
25       In applying these standards, federal courts review the last reasoned state court decision on
26 each claim for relief.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  "Where there has been
27 one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that
28 judgment or rejecting the same claim rest upon the same ground."  Ylst, 501 U.S. at 803; see also

Gill v. Ayers, 342 F.3d 911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look through" unexplained rulings of higher state courts to the last reasoned decision). When there is no reasoned state court decision or what is known as a silent denial, federal courts must conduct an independent review of the record to determine what rational could support the state court judgment and whether such rational was an objectively reasonable application of federal law. See Harrington v. Richter, 562 U.S. 86, 102 (2011); Cullen v. Pinholster, 563 U.S. 170 (2011); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

### III. Analysis

This court looks to the last reasoned state court decision in applying the 28 U.S.C. § 2254(d) standard. Wilson v. Sellers, 138 S. Ct. 1188 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797 (1991) (establishing the "look through" doctrine in federal habeas cases). In this case, the last reasoned state court decision denying both claims for relief is the California Court of Appeal decision on direct appeal. This court is therefore tasked with determining whether this state court decision was contrary to or an unreasonable application of clearly established federal law or unreasonably determined the facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d).

#### A. Vagueness Challenge to Human Trafficking Statute

In its reasoned opinion, the California Court of Appeal first described the relevant statutory framework penalizing human trafficking and pandering as separate crimes.

> Section 236.1, subdivision (c)[6] provides in part: 'A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, *a person who is a minor* at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking.' (Italics added.) A commercial sex act is 'sexual conduct on account of which anything of value is given or received by a person.' (§ 236.1, subd. (h)(2).) Trafficking a minor triggers a punishment triad of five, eight, or twelve years and a fine up to $500,000. (*Id.*, subd. (c)(1).) If force or fear is used, the punishment is 15 years to life and a fine of up to $500,000. (*Id.*, subd. (c)(2).)
>
> Pandering is punished less harshly. Section 266i, subdivision (a)(6)

---
[6] All statutory references are to the California Penal Code.

9

> provides that any person who does the following is guilty of pandering: 'Receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution, or to come into this state or leave this state for the purpose of prostitution.' Pandering an adult or a minor 16 years or older triggers a punishment triad of three, four, or six years. (*Id*., subds. (a), (b)(1).) Pandering a younger minor triggers a punishment triad of three, six, or eight years. (*Id*., subd. (b)(2).) A panderer is subject to fine of up to $5,000. (§ 266k, subd. (a).)

ECF No. 17-1 at 20. Next, the state court found that the Supreme Court's decision in Batchelder, 442 U.S. 114, directly foreclosed petitioner's claim for relief. ECF No. 17-1 at 21-23. It explained that "to the extent [petitioner]'s conduct could have been charged as either pandering or human trafficking--the former with less severe penalty provisions than the latter—[petitioner] has no legitimate complaint, because there is no vagueness about what the law prohibited under either statute. That different possible criminal labels and penalties may be attached to [petitioner]'s acts is unimportant under the reasoning of Batchelder…." ECF No. 17-1 at 24.

Fair minded jurists would not disagree on the correctness of the California Court of Appeals's decision in this case. See Harrington, 562 U.S. at 101. Nor can it be said that the state court unreasonably applied Batchelder to the human trafficking and pandering statutes at issue. 28 U.S.C. § 2254(d)(1). Simply because petitioner could have been prosecuted under either statute does not render them unconstitutionally vague. See Grooms v. Keeney, 826 F.2d 883, 888 (9th Cir. 1987) (rejecting due process and equal protection challenges to Oregon's aggravated felony murder statute even though it imposed greater penalty than felony murder because the statutes both gave clear notice of the conduct being proscribed). The Supreme Court rejected petitioner's exact argument in Batchelder by explaining that "[a]lthough the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." 442 U.S. at 123. On federal habeas review, this court is bound by "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The court finds

that with a Supreme Court decision on point, habeas relief is foreclosed on petitioner's first claim. Nor is there any evidence in the record that petitioner can point to in support of his argument that he was selectively prosecuted for the greater offense based on some invidious factor such as his race or gender. Batchelder, 442 U.S. at 123-24 (emphasizing that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants."). Absent such evidence, petitioner cannot meet his burden of demonstrating that the state court rejection of his claim was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2). For all these reasons, the undersigned recommends denying relief on claim one.

### B. Exclusion of Evidence Claim

The Sixth Amendment to the Constitution guarantees the right of a criminal defendant to have a public trial, to confront the witnesses against him and to obtain witnesses in his favor. These guarantees are incorporated by the due process clause of the Fourteenth Amendment, binding the states. Due process includes a right to "'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted).

The United States Supreme Court has not "squarely addressed" whether a state court's exercise of discretion to exclude evidence violates a criminal defendant's right to present relevant evidence. Moses v. Payne, 555 F.3d 742, 758–59 (9th Cir. 2009). Nor has it clearly established a "controlling legal standard" for evaluating discretionary decisions to exclude such evidence. Moses, 555 F.3d at 758-59; see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011). Indeed, the occasions in which the Supreme Court has found that the exclusion of defense evidence in a state criminal trial violates the Sixth Amendment are rare. See Rock v. Arkansas, 483 U.S. 44, 61 (1987) (finding state's *per se* rule excluding all hypnotically refreshed testimony was arbitrary); Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (holding that a state may not apply its evidentiary rules "mechanistically to defeat the ends of justice."); Washington v. Texas, 388 U.S. 14, 22-23 (1967) (explaining that the state evidentiary rule could not be rationally defended).

On direct appeal, the California Court of Appeal rejected petitioner's facial and as-

applied challenges to the state evidentiary rule excluding prior acts of prostitution by the victims. ECF No. 17-1 at 24-25. Because "it was not disputed *in this case* that both girls were prostitutes *before* the charged offenses, and defense counsel so argued to the jury," the trial court's evidentiary ruling did not actually deprive defendant of any relevant evidence. ECF No. 17-1 at 25 (emphasis in original). As a result, according to the state court, there was no prejudice that petitioner could demonstrate that would warrant relief. Id.

In this case, the trial court did not exclude all evidence that the victims had committed prior acts of prostitution. Victim B. testified that she had previously engaged in prostitution and petitioner also testified that both B. and D. had been prostitutes before he met them. ECF No. 18-8 at 172. As a result, petitioner's argument boils down to a constitutional challenge to the quantum of evidence he was allowed to introduce at trial concerning the victims' prior prostitution. This was not a case involving the *per se* exclusion of an entire category of evidence like in Rock v. Arkansas, 483 U.S. 44. In light of the trial testimony concerning the victims' prior prostitution that was admitted, petitioner cannot establish that his Sixth Amendment right to present a defense or confront his accusers was violated. Fair minded jurists would not disagree with the state court's rejection of this claim based on clearly established Supreme Court precedent.[7] The undersigned finds no constitutional error occurred based on the trial court's application of California Evidence Code § 1161(b). The court also finds that to the extent that there was any exclusion of evidence concerning the victims' prior prostitution, it did not have "[a] substantial and injurious effect or influence in determining the jury's verdict," i.e., it resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted). The jury simply found petitioner's testimony was not credible and a jury's credibility determination is

---

[7] A criminal defendant's right to present a defense is not unfettered and is subject to reasonable restrictions by the trial court. Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009). The weight of authority finds no clearly established federal law supporting petitioner's argument that a state evidentiary ruling, even if erroneous, supports the granting of habeas relief under the AEDPA. See Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011)(emphasizing the lack of Supreme Court authority "squarely address[ing]" a trial court's discretionary exclusion of evidence or "establish[ing] a controlling legal standard for evaluating such exclusions."); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

entitled to great deference on federal habeas review.  See Jackson v. Virginia, 443 U.S. 307, 326 (1979) (holding that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."); Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  For all these reasons, petitioner's last claim for relief should be denied.

### IV.   Plain Language Summary for Pro Se Party

The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed your habeas corpus application and the trial court record in your case.  The undersigned is recommending that your habeas petition be denied on the merits.  If you disagree with this result, you have 14 days to explain why it is incorrect.  Label your explanation "Objections to Magistrate Judge's Findings and Recommendations."  The district court judge assigned to your case will then review the entire record and make the final decision in your case.

### V.   Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the

objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 26, 2022

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/brow0291.F&R.merits.docx